**CAT RUN COAL CO., Plaintiff,**

v.

**Bruce BABBITT, Secretary of the Interior, and Robert Uram, Director of the Office of Surface Mining, Reclamation and Enforcement, Defendants.**

Civil Action No. 2:95–1063.

United States District Court,
S.D. West Virginia,
Charleston Division.

Aug. 8, 1996.

Robert G. McLusky, James R. Snyder, Jackson & Kelly, Charleston, WV, for plaintiff.

Steven C. Barcley, Special Asst. U.S. Attorney, U.S. Dept. of the Interior, Office of the Solicitor, Pittsburgh, PA, Rebecca A. Betts, United States Attorney, Charleston, WV, for defendants.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending are the parties' cross motions for summary judgment pursuant to *Rule 56* of the *Federal Rules of Civil Procedure*.[1] The parties agree there are no genuine issues of material fact extant. They have submitted the Administrative Record and memoranda in support of their respective positions. The matter is mature for the Court's consideration.

### THE STANDARD

Under *Rule 56(c)* of the *Federal Rules of Civil Procedure*, summary judgment is proper only:

> "If the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law."

Fed.R.Civ.P. 56(c).

### THE UNDISPUTED FACTS

Plaintiff Cat Run Coal Company ("Cat Run") is a member of the National Council of Coal Lessors, Incorporated ("NCCL"), and the owner of approximately thirty-five thousand acres of mineral and surface properties in West Virginia. Coal is mined on some portions of these properties pursuant to leases from Cat Run, while other portions of Cat Run's properties, which may contain minable coal reserves, are adjacent to properties owned by others. Mining on these properties could cause mining-related pollutants to discharge across, onto or from Cat Run's properties into area streams.[2]

Defendant Bruce Babbitt is the Secretary of the Interior ("Secretary") who, acting through the Federal Office of Surface Mining, Reclamation and Enforcement ("OSM"), is charged under the Federal Surface Mining Control and Reclamation Act ("SMCRA"),[3] 30 U.S.C. §§ 1201 *et seq.*, with reviewing and approving changes to West Virginia's surface mining program. Defendant Robert Uram is the Director of OSM. The regulatory authority responsible for implementing the state surface mining program in West Virginia is the West Virginia Division of Environmental Protection ("WVDEP").[4]

OSM requires states to adopt reclamation bonding programs to ensure complete recla-

---

1. Also pending is Plaintiff's Motion for Leave to File Surreply with the proposed surreply attached thereto. The Court GRANTS the motion and directs the Clerk to treat as filed the proposed surreply.

2. Cat Run asserts, and Defendants do not challenge, it has standing because the Secretary's approval of changes to West Virginia's surface mining program, which are the subject of this action, could require Cat Run as a landowner to pay the costs of reclaiming mine sites on or adjacent to its properties.

3. The SMCRA is designed to regulate the environmental impacts of surface coal mining. One of the primary objectives of the SMCRA is to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." 30 U.S.C. § 1202(a). In general, reclamation under the SMCRA requires the surface of land be restored to its approximate original contour and water polluted by the mining operation be properly treated before leaving the mining site. 30 U.S.C. § 1265(b)(2) & (10); 30 C.F.R. §§ 780.18(b)(9) and 780.21.

In order to achieve its goal of full reclamation of surface mining operations, the SMCRA requires those who propose to conduct surface mining operations to first obtain a permit. In order to obtain a permit, an applicant must, among other things, submit a detailed reclamation plan and furnish a performance bond. This bond is intended to fund reclamation should the permittee fail or refuse to reclaim the operation.

4. A state regulatory authority may become the agency primarily responsible for permitting and assuring compliance with the procedures and performance standards of the SMCRA. 30 U.S.C. § 1253. To obtain this authority, a state must adopt a regulatory program that contains laws no less stringent than the SMCRA and regulations no less effective than the SMCRA's regulations and which allocates adequate resources to implement the program. 30 U.S.C. § 1253(a)(1), (7). If, in the Secretary's opinion, a state program meets these criteria, the state agency becomes the primary regulatory authority responsible for enforcing and implementing the state program.

The State of West Virginia submitted such a program (comprised of the West Virginia Surface Coal Mining and Reclamation Act, W.Va.Code § 22–3–1 *et seq.* ("WVSMCRA") and accompanying regulations) and received primary regulatory authority for implementation and administration of the state program from the Secretary. *See* 30 C.F.R. § 948.1 (1991); 46 Fed.Reg. 5954 (Jan. 21, 1981).

mation of mine sites. OSM's regulations provide that if a reclamation bond is forfeited, but is inadequate to complete reclamation, "the *operator*[5] shall be liable for remaining costs." 30 C.F.R. § 800.50(d)(1) (emphasis added). OSM's regulations also allow the WVDEP to complete reclamation at bond forfeiture sites and to "recover *from the operator* all costs of reclamation in excess of the amount forfeited." 30 C.F.R. § 800.50(d)(1) (emphasis added).

On June 28, 1993, WVDEP submitted for OSM's approval numerous proposed changes to the WVSMCRA.[6] Included among those changes was a revision to the Code of State Regulations (C.S.R.) at § 38–2–12.4. Prior to the amendment, the regulation provided "[t]he *permittee* shall be liable for all reclamation costs, and the [Director of the WVDEP] shall collect *from the permittee* all costs in excess of the amount forfeited." C.S.R. § 38–2–12.4 (effective June 1, 1991) (emphasis added). These collections were deposited with the Special Reclamation Fund[7] to replace funds used by WVDEP. As modified regulation 12.4(e) states, "[t]he operator, permittee, *or other responsible party* shall be liable for all costs in excess of the amount forfeited. The Director may commence civil, *criminal* or other appropriate action to collect such costs." C.S.R. § 38–2–12.4(e) (emphasis added).

OSM announced receipt of the proposed amendments and invited public comment in a Federal Register notice published August 12, 1993. 58 Fed.Reg. 42903. Included in the notice was a nearly verbatim summary of the terms of C.S.R. § 38–2–12.4(e):

"The State also proposes to revise paragraph (e) of this subsection to provide that the operator, permittee, or other responsible party be liable for all costs in excess of the amount forfeited. The Director may commence civil, criminal or other appropriate action to collect such costs."

58 Fed.Reg. at 42909. Cat Run complains, however, the notice did not define who was intended to be covered by the term "other responsible party."

Comments opposing this amendment were submitted by the NCCL on September 13, 1993 and May 16, 1994. The NCCL commented: (1) there are no "responsible parties" other than "permittees" and "operators" under the SMCRA and the WVSMCRA, and therefore the addition of "other responsible parties" was at best confusing surplusage; (2) WVDEP employees represented the proposed revision allowed the agency to shift reclamation costs at bond forfeiture sites from the Special Reclamation Fund to landowners or royalty owners who were not otherwise "permittees" or "operators"; (3) any attempt to shift reclamation costs away from "permittees" or "operators" and the Special Reclamation Fund to landowners or royalty owners was not properly noticed, was unauthorized by the State Program, and was inconsistent with the SMCRA and the WVSMCRA, both of which were intended to protect landowners and to require that "op-

---

5. Under the SMCRA, an "operator" is "any person, partnership, or corporation engaged in coal mining." 30 U.S.C. § 1291(13). A "permittee" is the "person holding a permit" under the SMCRA. *Id.* at § 1291(18). West Virginia similarly defines "operator" and "permittee" and holds both responsible for the costs of reclamation. *See* W.Va.Code § 22–3–3(*o*) & (r); C.S.R. § 38–2–12.4(e).

6. All revisions were approved by the West Virginia Legislature in a process open to the public. *See* W.Va.Code § 29A–3–11 (Submission of legislative rules to the legislative rule-making review committee) and 29A–3–12 (Submission of legislative rules to Legislature).

7. The Special Reclamation Fund is a component of West Virginia's "alternative" two-tiered bonding system. The first tier requires permittees to post a site-specific reclamation bond of between $1,000 and $5,000 per acre of proposed surface disturbance. W.Va.Code § 22–3–11(a); C.S.R. § 38–2–11.2. Because the amount of this bond is artificially capped at $5,000 per acre, it is often inadequate to cover the full costs of reclamation. Accordingly, West Virginia created the second tier, a bond pool known as the Special Reclamation Fund, which supplements the site-specific reclamation performance bonds furnished by permittees. The Special Reclamation Fund is funded by a fee of $.03 per ton of coal mined assessed against "every person conducting coal surface-mining operations," and by civil penalties assessed by WVDEP on coal operators for violations of the federally-approved state program. W.Va.Code § 22–3–11(g).

erators" and "permittees" fully reclaim their mine sites.[8]

On May 19, 1995, OSM published a second Federal Register notice announcing the availability of a draft decision document on the WVDEP's proposed bonding program. The notice contained the addresses of the OSM and WVDEP offices where copies of the draft decision document could be obtained. In addition, this notice informed the public that one free copy of the document was available at OSM's Charleston Field Office upon request. 60 Fed.Reg. 26855. The notice did not include comment/response language nor advise the public that landowners could be liable for reclamation costs.

The draft decision document itself, however, contained a fulsome summary of the NCCL's comments and OSM's proposed responses. In apparent response to the NCCL's comments that the term "other responsible parties" was not defined, OSM's draft decision stated:

"Although West Virginia does not define 'other responsible party,' it is commonly understood that it would include any person who may be responsible for the mining operation.

West Virginia's proposed requirement is neither specifically authorized nor prohibited by SMCRA. However, it is consistent with the principles and purposes of SMCRA to ensure the reclamation of surface areas disturbed by coal mining. *See* SMCRA Section 102(e). Therefore, since the proposed provision does not conflict with any Federal requirements under SMCRA, the Director finds that the proposed provision does not conflict with

SMCRA or the Federal regulations, and he is approving it."

Draft Decision at 70–71 (B.9.d.(3)) (May 1995); *see also* 60 Fed.Reg. 51900, 51909 at B.9.d.(3) (Oct. 4, 1995).

OSM did not attempt to explain who was meant to be "any person who may be responsible for the mining operation," *i.e.*, whether the phrase included only those who might be liable otherwise under the SMCRA or others who could be liable for the effects of mining operations under statutes other than the SMCRA. OSM analogized to the Clean Water Act:

"[a]s discussed in finding B.9.d.(3), the proposed requirement in C.S.R. § 38–2–12.4(e) is not prohibited by SMCRA. Also, under the Federal Clean Water Act, a permittee, operator and/or landowner can be held responsible for the treatment of point source discharges that do not meet effluent limits after forfeiture."

*Id.* at 101; 60 Fed.Reg. at 51915.[9]

To the extent OSM intended the statements in the draft decision document to define the term "other responsible parties," this was the first public notice that WVDEP's regulation was intended to allow the WVDEP to shift the costs of mine reclamation, including treatment of acid mine drainage, from the liable parties under the SMCRA, *i.e.*, operators, permittees, and the Special Reclamation Fund they fund to guarantee their obligations, to persons who are *not* subject to the SMCRA but who yet may be liable under other statutes for the effects of unreclaimed mine sites.

No comments were received on proposed subsection 12.4(e) as a result of the May 19, 1995 Federal Register notice.

---

8. By letter dated May 24, 1994, OSM's Charleston Field Office Director informed the President of the NCCL that his comments would be evaluated and responded to in the Federal Register "when we make a final decision on the proposed program amendments." (Letter from Blankenship to Davis of 5/24/94).

9. In these statements, OSM failed to address who would be considered a "landowner" responsible for discharges under the Clean Water Act. For example, both the WVDEP and OSM failed to state or discuss whether the term "landowner" could apply to persons owning only the mineral estate rather than the surface; or to persons owning the surface estate but who have no rights in the mineral being mined; or to persons owning mineral rights but not rights in the coal being mined, or to persons who held no interest in the mineral or surface in place but who are entitled to an overriding royalty for coal mined from a particular tract; or to mineral or surface lessees.

Nonetheless, the relevant issue is not whether landowners can be held liable for water discharges under water pollution laws, but rather whether landowners can be held liable under a SMCRA-based regulation. .

By final rule making of October 4, 1995, OSM approved the WVDEP's changes to C.S.R. § 38–2–12.4(e). 60 Fed.Reg. 51900, 51909 and 51915.

Cat Run initiated this action pursuant to 30 U.S.C. § 1276 to appeal OSM's approval of this amendment to West Virginia's surface mining program.[10] Cat Run contends: (1) OSM violated the Notice and Comment Provisions of the Administrative Procedures Act ("APA"); (2) OSM breached its duties under the SMCRA and the APA by failing to require WVDEP to define the term "other responsible parties"; (3) the regulation is unconstitutionally vague[11]; and (4) OSM's actions in approving the amendment without defining the scope or meaning of "other responsible parties" were arbitrary, capricious, and inconsistent with law.

## THE LAW

### I.

### NOTICE AND COMMENT

To be effective, amendments to West Virginia's surface mining program require two particular notices be given. 30 C.F.R. § 732.17(h). First, the Director of OSM must publish a notice in the Federal Register announcing the receipt of the amendment. *Id.* at § 732.17(h)(1). The notice must signify the amendment is being reviewed by the Director and include, *inter alia*, the text or a summary of the proposed amendment. *Id.* at § 732.17(h)(2)(i). If the text is not included in the Federal Register notice, the notice must include the addresses where copies of the proposed amendment may be obtained and that each requestor may receive, free of charge, one copy of the proposed amendment from the Director. *Id.* at § 732.17(h)(2)(ii). Second, the subsequent decision approving or disapproving program amendments shall be published in the Federal Register. *Id.* at § 732.17(h)(12).

The Administrative Procedure Act ("APA"), 5 U.S.C. § 500, *et seq.*, requires notice of proposed rule making to be published in the Federal Register and to include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). This notice must be "sufficiently descriptive to provide interested parties with a fair opportunity to comment and to participate in the rule making." *Chocolate Mfrs. Ass'n of U.S. v. Block,* 755 F.2d 1098, 1104 (4th Cir. 1985) (citations omitted). After the agency gives "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," the agency must incorporate into the final rule "a concise general statement of [the rule's] basis and purpose." 5 U.S.C. § 553(c).

To be valid and effective the notice must "fairly apprise interested parties of all significant subjects and issues involved." *St. James Hosp. v. Heckler,* 579 F.Supp. 757, 763 (D.C.Ill.1984), *cert. denied,* 474 U.S. 902, 106 S.Ct. 229, 88 L.Ed.2d 228 (1985). The notice also must "adequately frame the subjects for discussion." *Citibank, Federal Sav. Bank v. F.D.I.C.,* 836 F.Supp. 3, 7 (D.D.C.1993) (quoting *Connecticut Light & Power Co. v. Nuclear Regulatory Comm'n,* 673 F.2d 525, 533 (D.C.Cir.), *cert. denied,* 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982)); *see also* S.Rep. No. 752, 79th Cong., 1st Sess. 14 (1945) ("[a]gency notice must be sufficient to *fairly apprise interested parties of the issues involved,* so that they may present responsive data or argument related thereto.") (emphasis added).

Conversely, notice that is too general to inform interested parties of the issues involved is inadequate. *See Small Refiner Lead Phase–Down Task Force v. United States EPA,* 705 F.2d 506, 549 (D.C.Cir.1983) (The EPA gave general notice which the Court held was too general to be adequate: "Agency notice must describe the range of

---

10. This Court has jurisdiction pursuant to 5 U.S.C. § 702 (Administrative Procedures Act), 28 U.S.C. § 1331 (diversity), and 30 U.S.C. § 1276(a) (SMCRA). Venue is proper pursuant to 30 U.S.C. § 1276(a).

11. Because the issues of the case are resolved on other grounds, it would be inappropriate for the Court to reach the Constitutional question. *See Mills v. Rogers,* 457 U.S. 291, 305, 102 S.Ct. 2442, 2451, 73 L.Ed.2d 16 (1982) (citations omitted).

alternatives being considered with reasonable specificity. Otherwise, interested parties will not know what to comment on, and notice will not lead to better-informed agency decision making."); *see also American Iron & Steel Inst. v. E.P.A.,* 568 F.2d 284, 290–92 (3d Cir.1977), *cert. denied,* 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978) (agency notice must fairly apprise interested persons "of all significant subjects and issues involved"; EPA's notice of proposed effluent regulations for "Iron and Steel Manufacturing" did not fairly apprise makers of specialty alloy steel that they would be subject to separate regulation); *Citibank,* 836 F.Supp. at 7 ("Notice which fails to alert the public to significant policy changes violates the APA's notice and comment provisions.").

■ Agencies may not defend their failure to provide adequate notice by relying on the fact that some sophisticated parties recognized, and even commented upon, the potential import of an otherwise improperly noticed proposed rule. *See Wagner Elec. Corp. v. Volpe,* 466 F.2d 1013, 1019 (3d Cir.1972) ("the fact that some knowledgeable manufacturers appreciated the [significance of the proposed rule] and so responded, is not relevant. Others possibly not so knowledgeable also were interested persons within the meaning of 5 U.S.C. § 553.").

Here, OSM published notices on August 12, 1993 announcing receipt of the amendments, on May 19, 1995 announcing the availability of a draft decision document, and on October 4, 1995 announcing the approval of the amendments. Clearly, OSM gave the requisite notice under the APA of proposed changes. Nevertheless, the question becomes whether the notice was adequate, *i.e.,* was the notice sufficiently descriptive to provide *interested parties* with a fair opportunity to comment.

■ The Court holds OSM's notice did not meet that standard. It was not until the May 1995 availability of the draft decision document that "landowners" were identified as "other responsible parties" as they had, under qualified circumstances, by the Clean Water Act. The phrase "other responsible party," however, yet remains undefined and unidentified. OSM's conclusory statement that "it is commonly understood that [the phrase 'other responsible party'] would include any other person who may be responsible for the mining operations" does not place interested parties such as landowners on notice. Far from apprising interested parties of the significant subjects and issues involved, OSM neglected to provide enough detail to alert some parties, *i.e.,* landowners and lessors, they should be "interested" at all. Further, OSM neither attempted to explain the factual and legal bases for § 38–2–12.4(e), nor did it frame any subjects for discussion.

The Court concludes C.S.R. § 38–2–12.4(e) was issued and approved by the Secretary in violation of the notice and comment requirements of the APA.

## II.

### OSM'S DUTIES UNDER THE SMCRA AND THE APA

Plaintiff further contends the notice was inadequate partially because OSM breached certain duties it has under the SMCRA. In approving newly proposed state regulations, OSM must determine whether the proposed regulations are "consistent with" the SMCRA, *see* 30 U.S.C. § 1253(a)(7), and "no less effective than" OSM's own regulations, *see* 30 C.F.R. § 730.5.

Concerning West Virginia's proposed "alternative bonding" regulations, OSM is required to fulfill this duty by making two determinations. First, OSM must determine whether the alternative bonding program would achieve the objectives of the SMCRA's bonding program, namely, to establish a bonding mechanism sufficient to assure complete reclamation of mining operations. 30 U.S.C. § 1259(c); 30 C.F.R. § 800.14. Second, OSM must determine the alternative bonding system "provide[s] a *substantial economic incentive* ... to comply with all reclamation provisions." 30 C.F.R. § 800.11(e)(2) (emphasis added).

Here, OSM failed to make either determination because it failed to apprehend the reach of the regulation proposed by

WVDEP. Rather than address the NCCL's comments regarding the potentially expansive scope of the amendment, OSM advanced a series of confusing and conclusory statements that validated the concerns of the NCCL. OSM contended: (1) it does not know what WVDEP intended as the scope of the phrase "other responsible parties," Answer ¶ 17 [12]; and (2) "it is commonly understood that it would include any other person who may be responsible for the mining operations," 60 Fed.Reg. 51900, 51909. Neither of these vague and contradictory assertions identify and define "other responsible party." Both assertions demonstrate OSM's lack of understanding of the scope and definition of the regulation it was reviewing. Thus, OSM provided no insight into the meaning of "other responsible party."

■ Given OSM's own confusion, it could not have discharged its obligation to determine whether the proposed rule was consistent with the SMCRA, whether West Virginia's alternative bonding program was sufficient to assure complete reclamation of mining operations, or whether the alternative bonding system provides substantial economic incentive for reclamation to be completed.

■ Plaintiff further contends OSM breached its duties under the APA. The APA provides after public notice, an opportunity for public comment and "consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a *concise general statement of their basis and purpose*." 5 U.S.C. § 553(c) (emphasis added). Conclusory statements will not suffice under this standard. *See Gray Panthers Advocacy Comm. v. Sullivan*, 936 F.2d 1284 (D.C.Cir.1991) (when agency allowed to issue new regulations that are at least as protective as existing regulations it must *explain* how new rules meet standard); *Natural Resources Defense Council, Inc. v. United States E.P.A.*, 824 F.2d 1258 (1st Cir.1987)

(EPA's conclusory statement that it "believes these provisions are adequate and necessary to avoid any significant degradation of the important drinking water sources provided by these Class I ground waters" did not adequately explain why requirements were promulgated); *St. James Hosp. v. Heckler*, 579 F.Supp. 757 (D.C.Ill.1984), *cert. denied*, 474 U.S. 902, 106 S.Ct. 229, 88 L.Ed.2d 228 (1985) (where apparently significant information has been brought to agency's attention or substantial issues of policy or gaps in its reasoning raised, statement of basis and purpose must indicate why agency decided criticisms were invalid.).

■ Here, OSM responded to NCCL's comments in a vague and conclusory fashion only, in a manner that provided no intimation as to the regulation's basis or purpose. Thus, OSM again fell short of its burden under the APA.

### III.

### INCONSISTENCY WITH THE LAW

Under the SMCRA, "[a]ny action subject to judicial review ... shall be affirmed unless the court concludes that such action is arbitrary, capricious, or otherwise inconsistent with law." 30 U.S.C. § 1276(a)(1). The APA further provides the Court shall:

"hold unlawful and set aside agency action, findings, and conclusions found to be ... (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law...."

5 U.S.C. § 706(2).

Plaintiff contends OSM's approval of C.S.R. § 38–2–12.4(e) was inconsistent with the SMCRA.[13] Section 505 of the SMCRA,

---

**12.** Defendants' Answer states: "The Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegation contained in paragraph 17 that the reason the WVDEP proposed the regulation at issue was to recoup Special Reclamation Fund expenditures from landowners and others 'who are not, and

cannot be, liable for such reclamation under either SMCRA or the WVSMCRA....'; therefore that allegation is denied."

**13.** Plaintiff also contends OSM's approval of C.S.R. § 38–2–12.4(e) was inconsistent with the West Virginia Water Pollution Control Act

30 U.S.C. § 1255, contains the requirements for state laws and regulations which become effective under the SMCRA:

"(a) No State law or regulation in effect [upon the date of enactment of this Act], or which may become effective thereafter, shall be superseded by any provision of this chapter or any regulation issued pursuant thereto, *except insofar as such State law or regulation is inconsistent with the provisions of this chapter.*

(b) Any provision of any State law or regulation in effect [upon the date of enactment of this Act], or which may become effective thereafter, which provides for more stringent land use and environmental controls and regulations of surface coal mining and reclamation operation than do the provisions of this chapter or any regulation issued pursuant thereto shall not be construed to be inconsistent with this chapter."

30 U.S.C. § 1255 (1977) (emphasis added).

The SMCRA consistently holds operators and permittees, not landowners, responsible for the reclamation of mine lands.[14] The SMCRA requires operators to follow both permit and performance standards that require operators to reclaim post-SMCRA mine sites. *See* 30 U.S.C. §§ 1258 (requiring "permittee" to submit a reclamation plan to state agency for approval as part of the surface mining permit) and 1265(b)(2), (3), (6), (7), (16), (19), (20) & (23) (imposing reclamation standards on "operators"). Even for pre-SMCRA sites, operators are required to pay a reclamation fee that is deposited into the Abandoned Mine Lands Trust Fund, which is used to reclaim mining sites created before the SMCRA. *See* 30 U.S.C. § 1232 (imposing reclamation fee on "operators").

("WVWPCA"), W.Va.Code § 22–11–1, *et seq.* Because the Court finds the challenged statute is inconsistent with the SMCRA, it need not address this issue.

**14.** Indeed, it is the purpose of the SMCRA to "assure that the rights of surface landowners and other persons with a legal interest in the land or appurtenances thereto are fully protected from such operations." 30 U.S.C. § 1202(b).

**15.** The SMCRA is the descendant of a number of bills that were designed to address the deleterious effects of coal mining. *See* H.R.Rep. No. 95–

The imposition of all reclamation costs on operators is consistent with and supported by the legislative history of the SMCRA.[15] Congress characterized Senate Bill 425, the "Surface Mining Act of 1973," as follows:

"The purpose of this bill is to effect the *internalization* of mining and reclamation costs, which are now being borne by society in the form of ravaged land, polluted water, and other adverse effects, of coal service [sic] mining.

\* \* \* \* \* \*

*The cost of the environmental controls and reclamation requirements provided for under the Act are properly borne by the mine operators....*"

119 Cong.Rec. 33181 (Oct. 8, 1973) (emphasis added).

Similarly, OSM regulations provide the costs of mining are to be borne solely by coal operators. In promulgating its ownership and control rules, OSM recognized direct liability for compliance with the SMCRA belongs solely to the operator and permittee.[16] In response to concerns that OSM's rule would shift direct liability from one entity to another, OSM stated:

"[OSM] disagrees. As explained more fully in the October 3, 1988 (53 FR 38868) ownership and control rule, *neither that rule nor this one makes one legal entity responsible for abating the violation or paying the penalty or fee of another.*"

54 Fed.Reg. 18438, 18443 (April 28, 1989) (emphasis added). OSM further stated:

"*The responsibility for reclamation will continue to fall on the permittee and its agents, as the law requires.*"

218, 95th Cong., 1st Session, at 57 (1977) U.S.Code Cong. & Admin.News 1977, at 595. Two of these bills passed, but both met a Presidential veto. These bills were "fine-tuned" and passed as the SMCRA in 1977. The legislative history of the earlier bills further demonstrates Congress' intent that the costs of mining should be borne solely by those engaged in the mining industry.

**16.** For a discussion of OSM's ownership and control rules, see *Arch Mineral Corp. v. Babbitt,* 894 F.Supp. 974 (S.D.W.Va.1995) (Haden, C.J.).

53 Fed.Reg. 38868, 38885 (Oct. 3, 1988) (emphasis added). Thus, OSM itself has recognized neither the SMCRA nor the ownership and control rules extend reclamation liability beyond the operator or permittee.[17]

The internalization of these costs is further mandated by the SMCRA's bonding provisions. The SMCRA requires *permittees* to file reclamation bonds "sufficient to assure the completion of the reclamation plan . . . in the event of forfeiture." 30 U.S.C. § 1259.

OSM has also recognized permittee/operator liabilities do not extend to mineral lessors or other landowners. In its original ownership and control rule making, OSM recognized lessors and mineral owners should not be presumed to control operators, much less be directly responsible for the operator's compliance with the SMCRA:

> "[OSM] has decided *not to establish a standard whereby a coal owner or lessor would be presumed to control the conduct of a surface coal mining operation if it receives any economic benefit from the mining or marketing of coal. Such a presumption would be too broad* because in almost every contract mining situation the coal owner or lessor derives some economic benefit from the mining and marketing of the coal produced."

53 Fed.Reg. at 38878 (Oct. 3, 1988) (emphasis added).[18]

By approving the challenged regulation, OSM has attempted to externalize the costs of reclamation in direct contravention of the clear statutory language and legislative history of the SMCRA. The amended regulation effectively allows WVDEP to transfer the costs of reclamation from operators and permittees (and the reclamation bond pool they finance) to the landowners expressly protected under the SMCRA.

 Thus, to the extent C.S.R. § 38–2–12.4(e) attempts to impose liability on landowners and others for the costs of reclamation, it is inconsistent with the SMCRA.[19]

## CONCLUSION

Based upon the foregoing reasons, the Court declares and adjudges C.S.R. § 38–2–12.4(e) was issued and approved invalidly by OSM. Accordingly, the Court **GRANTS** Plaintiff's motion for summary judgment and **DENIES** Defendants' motion for summary judgment.

The Court **ORDERS** the action dismissed with prejudice.

---

17. Moreover, in ensuring West Virginia's alternative bonding program achieves the objectives of the SMCRA, OSM consistently has demanded all reclamation costs, including water treatment, be covered *not* by landowners and others, but solely by the bond system funded by coal operators and permittees. Accordingly, OSM has: (1) refused to approve, on the grounds it was inconsistent with the SMCRA, a WVDEP regulation that would have made use of the Special Reclamation Fund discretionary, 30 C.F.R. § 948.15(k)(8) (1994); (2) directed WVDEP to adopt a regulation making WVDEP's use of the bond pool mandatory, 30 C.F.R. § 948.16(p) (1990) and 53 Fed. Reg. 21304 (May 23, 1990); (3) refused to approve a WVDEP regulation limiting the annual expenditure of bond pool monies on water treatment to twenty-five percent (25%) of bond pool fee collections, 30 C.F.R. § 948.16(jjj) (1996) and 60 Fed.Reg. 51900, 51902 (Oct. 4, 1995); and (4) directed West Virginia to amend its bonding program to ensure sufficient money be available to complete reclamation, including the perpetual treatment of polluted water to meet the Clean Water Act standards, at all existing and future bond forfeiture sites, 30 C.F.R. § 948.16(lll) (1996). In so doing, OSM has required an industry-supported bond system that ensures the payment of all present and future reclamation costs and, thereby, one that internalizes the costs of mining in a manner consistent with the SMCRA.

18. Furthermore, OSM's own bonding regulations recognize the operator or permittee alone must bear the costs of reclamation. In the event of bond forfeiture, its regulations provide that the regulatory authority may complete reclamation and "recover from the *operator* all costs of reclamation in excess of the amount forfeited." 30 C.F.R. § 800.50(d) (emphasis added). The regulations do not permit actions against landowners. OSM's regulations also provide that state alternative bonding systems must provide *permittees* with substantial economic incentives to reclaim mine sites. 30 C.F.R. § 800.11(e)(2).

19. The Court finds no evidence, however, to support Plaintiff's contention that OSM's actions were arbitrary or capricious.